# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Michael D.,<br><br>　　　　Plaintiff,<br><br>v.<br><br>Andrew Saul, Commissioner of Social Security,<br><br>　　　　Defendant. | Case No. 18-cv-2803 (HB)<br><br>**ORDER** |

HILDY BOWBEER, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Michael D. seeks judicial review of a final decision by the Commissioner of Social Security denying his applications for supplemental security income ("SSI") and disability insurance benefits ("DIB"). The matter is before the Court on the parties' cross-motions for summary judgment. In Plaintiff's motion for summary judgment, he contends the administrative law judge ("ALJ") did not properly consider medical evidence concerning the dexterity and strength of his right hand and arm. The Commissioner responds that the ALJ's findings were supported by substantial evidence of record. For the reasons set forth below, the Court find that the ALJ's decision was supported by substantial evidence and therefore denies Plaintiff's motion and grants Defendant's motion.

## I.   Background

### A.   Procedural History

Plaintiff filed applications for SSI and DIB on September 3, 2015, alleging a

disability onset date of June 11, 2015.  (*See* R. 15.)[1]  The applications were denied initially and on reconsideration, and Plaintiff timely requested a hearing before an ALJ.  (*Id.*)  The ALJ convened a video hearing on December 7, 2017, at which Plaintiff, medical expert Dr. Andrew M. Steiner, and vocational expert Kimberly E. Eisenhuth testified.  (*Id.*)

On January 12, 2018, the ALJ issued a written decision denying Plaintiff's SSI and DIB applications.  (R. 12–34.)  The relevant findings and conclusions are described below.  The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  Plaintiff then filed this action for judicial review.

The parties filed cross-motions for summary judgment pursuant to the procedures set forth in District of Minnesota Local Rule 7.2.  Plaintiff identifies "two major flaws in the ALJ's decision."  (Pl.'s Mem. Supp. Mot. Summ. J. at 3 [Doc. No. 20].)  Both relate to his right hand.  The first alleged error is that the ALJ did not properly consider findings of a "marked reduction in grip and pinch strength in the right hand."  (*Id.* at 3–4.)  The second alleged error is that the ALJ used normal x-ray findings and test results to reject an occasional handling and fingering restriction despite the x-ray and tests having been ordered for another impairment.  (*Id.* at 4.)

### B.     Medical and Other Evidence Related to Plaintiff's Right Hand

The Court will recount the facts of record only to the extent they are helpful for

---

[1] The administrative record (R.) is located on the docket at ECF No. 10.

context or necessary for resolution of the specific issues presented in the parties' motions. Given that the issues presented in the parties' motions center on Plaintiff's right hand and arm, the Court will focus on that evidence.

Plaintiff experienced right hand and arm weakness as a result of several strokes and seizures he suffered after an aortic root repair surgery in June 2015. (*See* R. 433–36.) A progress note from August 2015 reflects "mild weakness of right hand grip." (R. 435.)

Plaintiff attended occupational therapy sessions from January to May 2016, during which he was prescribed home exercises for his right hand. (*E.g.*, R. 1415, 1417, 1426.) The therapist noted poor right hand coordination due to weakness. (*E.g.*, R. 1420, 1425.) His ability to grip and pinch with his right hand was significantly less than his left hand. (*E.g.*, 1454.) The May 18, 2016 discharge note, however, indicates that Plaintiff met his targets for right hand grip and pinch strengthening and functioning a month ahead of the target date. (R. 1499-1500, 1504.)

On January 29, 2016, Dr. Thomas Henry examined Plaintiff and noted mildly increased tone of the right arm and leg, 4/5 weakness of the right grip, but otherwise normal strength on the right. (R. 1434.) Sensations were normal. (*Id.*) In May 2016, Plaintiff reported numbness and weakness in his right hand, especially with pincer grasping, to Dr. Hnouchi Lochungvu. (R. 1319.) The neurological portion of the exam documented decreased pincer grasp strength of the right hand. (R. 1322.) Dr. Lochungvu told Plaintiff to follow up with a neurologist, but if he was unable to do so, a referral or an EMG test would be considered. (*Id.*) In April 2016, Dr. Robert Bache documented right hand weakness due to Plaintiff's stroke. (R. 1488, 1493.) At an

appointment with Dr. Bache on June 14, 2016, Plaintiff reported decreased strength in his right hand, but Dr. Bache did not include that in the examination findings. (R. 1510.)

On November 22, 2016, Plaintiff was admitted to the hospital for mid-chest pain and heavy alcohol use. (R. 1792.) Plaintiff did not report any right hand weakness or other infirmity with his right hand or arm, nor did the provider note any on examination. (R. 1792–94.) Plaintiff returned to the hospital four days later for treatment of alcohol intoxication. (R. 1818.) He did not describe any right hand or arm symptoms, nor did the provider find any on examination. (*Id.*) There are similar records from two periods of time August 2017 and again in September 2017. (R. 1858–62, 1880, 1901–04, 1932.)

On October 31, 2017, Plaintiff attended a cardiovascular follow-up appointment with certified nurse practitioner Jenni Tharaldson. (R. 2086.) The progress note reports diagnoses of check pain, thoracic aortic aneurysm without rupture, and essential hypertension. (*Id.*) There is no indication on the progress note that Plaintiff complained of right hand or arm weakness, paresthesia,[2] or lack of dexterity. Tharaldson conducted a neurological examination as part of the overall checkup and noted Plaintiff's strength was "5+ and symmetric." (*Id.*)

About a week later, on November 9, 2017, Plaintiff attended an appointment with Dr. Heather Grothe for right "wrist pain." (R. 2091.) Right hand pain was also documented. (R. 2089.) Dr. Grothe ordered an x-ray of Plaintiff's right hand, which

---

[2] Paresthesia is "[a] spontaneous abnormal usually nonpainful sensation (*e.g.*, burning, pricking); may be due to lesions of both the central and peripheral nervous systems." Stedmans Medical Dictionary 653800, available on Westlaw (database updated Nov. 2014).

4

revealed no bony abnormalities or fractures. (*Id.*) The diagnoses reflected on the progress note are "right hand weakness-primary" and "right hand paresthesia." (R. 2091.) Dr. Grothe recorded Plaintiff's self-reported complaints of "loss of mobility and loss of grip," paresthesia in his right hand, and difficulty with coordination. (*Id.*) On examination, Dr. Grothe found "reduced sensation in the 1st, 2nd, and 3rd digits"; thenar atrophy; "pain-free range of motion at the wrist, MCPs, DIPs, and PIPs"; a negative Tinel's test at the cubital tunnel, but otherwise equivocal; an equivocal Phalen's test; and negative TFCC grind, CMC grind, and Finkelstein's test. (R. 2094.) Dr. Grothe's final impression was "right hand paresthesias concerning for carpal tunnel." (*Id.*) She ordered an EMG to provide a more definite diagnosis and discussed with Plaintiff the possibility of using night splints. (*Id.*) There is no evidence in the record that Plaintiff followed through with the EMG.

At the hearing before the ALJ, Plaintiff testified that he had five strokes after his heart surgery, which affected his right hand the most. (R. 54.) His strength had continued to improve over time, but he had difficulty with daily activities such as tying his shoes, buttoning a shirt, using a pen, picking up a paper clip, and holding a phone. (R. 54, 56–58, 68–69.)

Dr. Steiner testified at the hearing that Plaintiff had recently reported numbness, tingling, and loss of sensation in his right hand, which suggested carpal tunnel syndrome. (R. 71–72.) An EMG had been requested but there were no test results in the record. (R. 72–73.) Dr. Steiner further testified there was no evidence of ongoing right hand weakness in the November 2017 progress note. (R. 72.) Dr. Steiner acknowledged a

5

May 2016 progress note documenting weakness with pincer grasping, but there was no grading of the severity of the weakness or an assessment of what Plaintiff could still do. (R. 73–74.) With respect to the right hand atrophy at the base of the thumb, Dr. Steiner testified that condition was consistent with carpal tunnel syndrome, not a stroke. (R. 74.) Dr. Steiner opined that Plaintiff's recent symptoms pointed to carpal tunnel syndrome and it appeared to Dr. Steiner that Plaintiff's doctors believed similarly. (*Id.*) Based on the medical and other relevant records, Dr. Steiner believed that right hand power gripping would be precluded and that right hand fingering and handling would be limited to frequent rather than continuous. (R. 75.) Because loss of sensation in the right hand was a relatively new symptom, Dr. Steiner declined to add any limitations related to that symptom. (*Id.*)

    **C.**    **The ALJ's Decision**

In deeming Plaintiff not disabled, the ALJ followed the five-step sequential analysis outlined in 20 C.F.R. §§ 404.1520(a) and 416.920(a). The ALJ first concluded that Plaintiff had not engaged in substantial gainful activity since June 11, 2015. (R. 18.) At step two, the ALJ determined that Plaintiff had severe impairments of "alcohol dependence, cannabis dependence, post-traumatic stress disorder (PTSD), dysthymia, anxiety disorder, panic disorder with agoraphobia, multifocal brain dysfunction, dissecting aneurysm of the thoracic aorta status post repair in June 2015, cerebral vascular accident (CVA), right hand paresthesias and weakness of unknown etiology, alcoholic hepatitis, and a seizure disorder." (R. 18.)

At step three, the ALJ determined that Plaintiff's mental impairments, including

6

the substance abuse disorder, met Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders) of 20 C.F.R. part 404, subpart P, appendix 1. (R. 19.) But if Plaintiff stopped his substance use, the ALJ found, he would not have a mental impairment or combination of impairments that met or medically equaled a listed impairment. (R. 20.)

With respect to Plaintiff's physical impairments, the ALJ concluded they did not meet or equal a listed impairment. (R. 20.) With particular respect to Plaintiff's right hand, the ALJ found that Plaintiff was able to perform fine and gross movements and there was no evidence of a marked limitation in functioning. (R. 20–21.) Though Plaintiff experienced reduced right hand strength after a hospitalization in June 2015, his strength was a 5/5 and symmetric by October 2017. (R. 21 (citing R. 2086).)

At step four, the ALJ determined that if Plaintiff stopped his substance use, he would have the residual functional capacity ("RFC")[3] to perform sedentary work, as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), to lift, carry, push, and pull 10 pounds occasionally and less than 10 pounds frequently; to sit 6 hours in an 8-hour workday; to stand or walk 2 hours in an 8-hour workday; and to frequently handle and finger with the right upper extremity; but could not use his right hand to power grip or

---

[3] An RFC assessment measures the most a person can do, despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ must base the RFC "on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). The RFC assessment actually occurs between steps three and four of the sequential evaluation, but for ease of reference, the Court will refer to the RFC assessment as part of step four.

torque with tools; could not climb ladders, ropes, or scaffolds; and could not be exposed to unprotected heights or moving mechanical parts. (R. 23.)

In arriving at the above RFC, the ALJ summarized the medical and other evidence related to Plaintiff's right hand and arm and made several relevant findings. Although Plaintiff initially experienced some right arm and hand weakness after the strokes in June 2015, a neurological evaluation in August 2015 revealed no deficits and only mild weakness in his right hand grip. (R. 25.) In December 2015, his strength in all extremities was 5/5, except for his right hand. (*Id.*) Reduced right hand strength was noted again in January and May 2016. (R. 26.) The ALJ explicitly rejected Plaintiff's suggested limitation to occasional right hand use because Plaintiff did not follow up with an EMG to assess the etiology of his right arm weakness in 2016, and clinical findings did not support his subjective complaints of reduced grip strength and decreased coordination in his right hand in November 2017. (R. 26–27.) The ALJ remarked: "Given the uncertainty of the diagnosis and lack of follow through in determining the nature of [the] right hand condition, an occasional handling and fingering restriction is not supported. The current right hand limitations . . . adequately address the right hand weakness discussed by the medical expert." (R. 27.)

The ALJ took note of Plaintiff's hearing testimony about his claimed residual limitations, including difficulty using his right hand to write, use a phone, and tie his shoes. (R. 24.) The ALJ also summarized the testimony of Dr. Steiner, including Dr. Steiner's testimony that compliance with treatment recommendations had been problematic, including alcohol use. (*Id.*) The ALJ gave substantial weight to

Dr. Steiner's opinion that Plaintiff could not power-grip with his right hand but could finger and handle frequently. (*Id.*) The ALJ declined to impose any right hand restrictions related to paresthesia due to the recency of that symptom. (*Id.*)

In light of the assessed RFC, the ALJ determined that Plaintiff could not perform his past relevant work but that he could adjust successfully to other jobs like a call-out operator, document preparer, and "touch up screener printed circuit," if he stopped the substance use. (R. 32–33.) Consequently, Plaintiff was deemed not disabled.

## II. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or the Court would have decided the case differently. *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden to prove disability. *See Roth v. Shalala*, 45 F.3d 279,

9

282 (8th Cir. 1995). To meet the definition of disability for DIB, the claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The same standard applies to SSI. *See* 42 U.S.C. § 1382c(a)(3)(A). The disability, not just the impairment, must have lasted or be expected to last for at least twelve months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

## III. Discussion

### A. Physical and Occupational Therapy Notes

The first error alleged by Plaintiff is that the ALJ failed to consider medical findings that support a "marked" limitation in gripping and pinching with the right hand. Plaintiff cites to a batch of progress notes from physical therapist Monica Wanino covering the timespan from January to May 2016. (Pl.'s Mem. at 4; R. 1298–1314.) But Plaintiff mischaracterizes Wanino's notes. Wanino never described Plaintiff's grip or pinch strength as "marked." Rather, Wanino's notes indicate that Plaintiff's right hand and arm significantly improved over the months of therapy. By March 2016, Plaintiff's right arm strength was a 5/5, except when his shoulder was flexed, Plaintiff's right arm strength was a 4/5. (R. 1304.) He could grip 21 pounds with his right hand and 67 pounds with his left hand, and he could pinch 1.7 pounds with his right hand and 16 pounds with his left hand. (R. 1306.) Plaintiff's physical therapy goals included strengthening his right hand and increasing his grip and pinch strength by five pounds.

(R. 1308.) When he was discharged from physical therapy the following month, Wanino noted that Plaintiff had "met all goals." (R. 1314.) There is no evidence post-dating Wanino's notes indicating that Plaintiff had markedly limited grip or pinch strength, and certainly not for a twelve-month period.

Significantly, Plaintiff attended occupational therapy during the same six-month timeframe, and the ALJ did cite to and rely on those records, which evidence a similar trajectory of improvement. Those progress notes show that Plaintiff met his right hand functioning goals—including increasing his grip and pinch strength by five pounds each—by May 18, 2016, one month ahead of the target date. (R. 1500, 1504.)

Because the ALJ cited to and relied on similar occupational therapy progress notes, and because neither the physical therapy progress notes nor the occupational therapy notes support a finding of a marked limitation in grip and pinch strength that lasted more than twelve months, the Court concludes that the ALJ did not err by not explicitly discussing Wanino's physical therapy notes.

### B. Dr. Eric Waldron's Opinion

Plaintiff next faults the ALJ for giving only limited weight to findings by Dr. Eric Waldron concerning Plaintiff's fine motor dexterity. (Pl.'s Mem. at 4; R. 30.) Dr. Waldron conducted a neuropsychological evaluation of Plaintiff in March 2016 and noted that "[s]peeded fine motor dexterity was severely impaired for the dominant, right hand (with 7 peg drops), and also impaired for the left hand." (R. 1283–84) The ALJ gave little weight to Dr. Waldon's opinion because it was not clear whether he would eliminate simple, routine tasks; the report did not contain a function-by-function

11

assessment; and Dr. Waldron did not account for recent, new medication. (R. 30.) In addition, the Court observes that Dr. Waldron did not conduct a physical examination of Plaintiff, was not asked to specifically evaluate Plaintiff's right arm or hand strength or dexterity, met Plaintiff only once, and did not treat Plaintiff. These factors support the ALJ's decision to give little weight to Dr. Waldron's findings concerning his right arm and hand. *See* 20 C.F.R. § 416.927(c) (listing factors for weighing medical opinions as the existence of an examining relationship, the nature of the treatment relationship, the degree to which the opinion is supported by other medical evidence, consistency with the record, the source's specialty, and other relevant factors). Dr. Waldron's findings also were not consistent with contemporaneous physical and occupational therapy treatment notes, which did not document severely impaired fine motor dexterity in Plaintiff's right hand or impaired fine motor dexterity in his left hand.

### C. Dr. Grothe's November 2017 Progress Note

The next error alleged by Plaintiff is that the ALJ improperly used normal x-ray and equivocal Phalen's and Tinel's test results to reject Plaintiff's proposed occasional handling and fingering restriction. (Pl.'s Mem. at 4.) The x-ray and test results to which Plaintiff refers were ordered by Dr. Grothe in November 2017. It is apparent from Dr. Grothe's progress note that Plaintiff was seeking treatment for wrist pain—though right hand pain, weakness, loss of mobility, loss of coordination, and loss of grip were also documented—and that Dr. Grothe suspected carnal tunnel syndrome as the cause. Thus, she ordered an x-ray of Plaintiff's right hand and performed the Phalen's and Tinel's tests.

12

Contrary to Plaintiff's argument, it is clear from the context of the ALJ's decision that his reference to the normal x-ray and equivocal Phalen's and Tinel's tests was simply part of a summary of the progress note in general, not the basis for any findings. (*See* R. 27.) That is, the ALJ did not reject Plaintiff's proposed occasional handling and fingering restriction because of the x-ray and test results; rather, he rejected the proposed restriction because of "the uncertainty of the diagnosis and lack of follow through in determining the nature of the right hand condition." (*Id.*)

These findings are supported by the record. Dr. Grothe was attempting to determine whether Plaintiff's right hand weakness and paresthesia were attributable to his history of stroke or carpal tunnel syndrome. (*E.g.*, R. 2095 ("Right hand weakness / Right hand paresthesia / . . . Right upper extremity Hx of stroke Right hand weakness [carpal tunnel syndrome] vs Ulnar nerve vs proximal etiology.").) If the symptoms Plaintiff described to Dr. Grothe (right hand pain, weakness, loss of mobility, loss of coordination, and loss of grip) were attributable to carpal tunnel syndrome rather than his stroke, that would not only be a new diagnosis but would also implicate the twelve-month durational requirement. Notably, Dr. Grothe did not note any grip or pinch weakness on examination, which indicates those symptoms had resolved. It is also significant that Plaintiff did not complain of or seek treatment for right hand or arm weakness for more than a year, between at least June 2016 until November 2017. This passage of time supports the ALJ's finding that the diagnosis in November 2017 was uncertain.

As for Plaintiff's failure to follow through with the EMG, a claimant's failure to undergo recommended testing that could aid in properly diagnosing and treating the

13

condition supports a decision to reject claimed limitations. *See Thomas v. Sullivan*, 928 F.2d 255, 259–60 (8th Cir. 1991). Consequently, the ALJ did not err in rejecting Plaintiff's proposed occasional handling and fingering restriction on this basis.

### D. Dr. Steiner's Testimony

Plaintiff argues the ALJ erred by relying on Dr. Steiner's testimony because Dr. Steiner erroneously testified there was no evidence of ongoing weakness in the right hand. (Pl.'s Mem. at 18.) Plaintiff is correct that Dr. Steiner initially testified as such, but the ALJ followed up by specifically asking Dr. Steiner about Dr. Grothe's November 2017 progress note and Dr. Lochungvu's May 2016 progress note. (R. 72–73.) Dr. Steiner responded that neither of those providers graded the severity of the weakness or assessed Plaintiff's residual functionality. (R. 73–74.) That testimony was accurate, and it is clear from the ALJ's mention of right hand weakness in the RFC analysis that he did not rely on Dr. Steiner's initial testimony to reject outright that claimed limitation. (*E.g.*, R. 26.)

### E. Additional Findings Challenged by Plaintiff

Plaintiff identifies three other findings by the ALJ with which he disagrees: that transferability of job skills is not material because he is capable of only sedentary work, that there are no jobs existing in significant numbers for an individual with the RFC for which he advocates, and that his substance use has no impact on the function of his hands. (Pl.'s Mem. at 21–22.) Those findings either flowed from other findings the Court has already discussed and found supported by substantial evidence, or would have no material effect on the Court's review of the ALJ's decision. In addition, Plaintiff does

not develop any of these arguments and the Court therefore deems them waived.

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment [Doc. No. 19] is **DENIED**; and

2. Defendant's Motion for Summary Judgment [Doc. No. 24] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: March 23, 2020    s/ *Hildy Bowbeer*
HILDY BOWBEER
United States Magistrate Judge